**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**

**ELITE AUTOS LLC**                                                                    **PLAINTIFF**


**v.**                          **Case No. 3:19-cv-00361-LPR**


**SPARKS MOTORS LLC**                                                          **DEFENDANT**


**ORDER**

On December 13, 2019, Defendant Sparks Motors ("Sparks Motors") removed this case from Craighead County Circuit Court on the basis of diversity jurisdiction.[1]  Sparks Motors then moved to dismiss for lack of personal jurisdiction on December 27, 2019.[2]  After that Motion, Plaintiff Elite Autos ("Elite Autos") filed a "Second Amended Complaint" and a Response to the Motion to Dismiss.[3]  Subsequently, Sparks Motors filed an Amended Motion to Dismiss for lack of personal jurisdiction on January 31, 2020.[4]  Elite Autos filed a Response to the Amended Motion to Dismiss on February 13, 2020.[5]

On May 29, 2020, the Court ordered the parties to either file a joint stipulation or independently provide affidavits or declarations addressing several questions of fact.[6]  Elite Autos submitted a Declaration from its sole operator, Shelby Smith, and attached to that Declaration some text message conversations between employees and agents of the parties.[7]  Likewise, Sparks

---

[1]   Def.'s Notice of Removal (Doc. 1).

[2]   Def.'s Mot. to Dismiss (Doc. 5).

[3]   Pl.'s Second Am. Compl. (Doc. 16); Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss (Doc. 17).

[4]   Def.'s Am. Mot. to Dismiss (Doc. 18).

[5]   Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19).

[6]   Order (Doc. 20).

[7]   Pl.'s Decl. (Doc. 21).

Motors submitted a Declaration from its Shop Manager, Hans Peterson, along with text messages.[8] Some of the text message conversations overlapped with the ones submitted by Elite Autos, but some were new information.

Based on the entire record (including but not limited to these declarations and text messages) and for the reasons discussed below, the Court determines that it cannot constitutionally assert personal jurisdiction over Sparks Motors in this matter.  Both parties agree that, in such a situation, the Court has discretion to choose between dismissing the case or instead transferring it to the federal district court for the district of Utah.[9]  The Court determines that transfer is most appropriate.  Accordingly, Sparks Motors's Amended Motion to Dismiss is GRANTED in part and DENIED in part.[10]

## Which is the Operative Complaint?

Before resolving the personal jurisdiction argument, there is a threshold matter the Court must briefly addresses.  Within its Amended Motion to Dismiss, Sparks Motors argues that the Second Amended Complaint should be stricken because Elite Autos did not seek leave to file it.[11] Federal Rule of Civil Procedure 15(a)(1) only allows *one* amendment without leave of the Court.[12] Prior to removal of this case to federal court, Elite Autos had already amended its Complaint once.[13]  Sparks Motors says that the previous state court amendment counted as the *one* amendment

---

[8]  Def.'s Decl. (Doc. 22).

[9]  Def.'s Br. (Doc. 24) at 1-2; Pl.'s Resp. (Doc. 25) at 1-2.

[10]  Def.'s Am. Mot. to Dismiss (Doc. 18); Pl.'s Second Am. Compl. (Doc. 16).  As discussed below, the Court will treat the Second Amended Complaint as the operative complaint in this case.  Because the first Motion to Dismiss was filed prior to the Second Amended Complaint, and the Amended Motion to Dismiss includes all personal jurisdiction arguments from the first Motion to Dismiss, the first Motion to Dismiss (Doc. 5) is DENIED as moot.

[11]  Def.'s Am. Mot. to Dismiss (Doc. 18) at 1-2.

[12]  FED. R. CIV. P. 15(a)(1).  Sparks Motors expressly or implicitly concedes that the other requirements for amendment as of right are met.

[13]  Ex. 1 to Def.'s Suppl. to Notice of Removal (Doc. 4-1).

allowed without leave of the court.[14]  Elite Autos says that the amendment in state court doesn't count for purposes of applying the federal rule post-removal.[15]  Neither side provides any controlling precedent.[16]

The Court will not strike the Second Amended Complaint.  It is not entirely clear that the amendment in state court counts for purposes of Rule 15's allotment of one amendment without leave of the Court.[17]  If the initial amendment in state court does not count, then leave of the Court was not necessary to file the Second Amended Complaint here.  If the initial amendment in state court does count, then the lack of clarity surrounding whether it counted more than excuses Elite Autos's attempt to file a Second Amended Complaint without first seeking leave to do so.

While the Court could force Elite Autos to go through the procedural hoops associated with seeking leave to amend its complaint, the Court does not believe this is a useful exercise in the circumstances of this case.  If leave of the Court is needed, this is a slam dunk case for granting leave to amend.  The case is still in its preliminary stages.  Discovery has yet to commence.  The core facts of the Complaint did not change with the Amendment.  There is no sand-bagging or notice problem.  In short, there is no prejudice to Sparks Motors, and no hint of undue delay, gamesmanship, or bad faith by Elite Autos.  Federal Rule of Civil Procedure 15(a)(2) and governing caselaw instructs the Court to freely give leave to amend in such situations.[18]

---

[14]  Def.'s Am. Mot. to Dismiss (Doc. 18) at 1-2.

[15]  Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19) at 1-3.

[16]  Sparks Motors does not provide any caselaw at all.  Def.'s Am. Mot. to Dismiss (Doc. 18) at 1-2.  Elite Autos points to a Magistrate Judge's recommended disposition in the District of New Mexico.  Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19) at 2-3 (citing *Steward v. Emerald Corr. Mgmt., LLC*, No. CV 13-1073 WJ/GBW, 2014 WL 12798369, at *2 (D.N.M. Jan. 24, 2014)).  That recommended disposition does not persuade this Court.  The Tenth Circuit case it cites simply stands for the proposition that removal to federal court does not preclude one amendment as of right.  It says nothing about whether an amendment in state court prior to removal counts as the one amendment for purposes of the federal rule.  And the recommended disposition's *very* brief analysis of the language of the Rule itself is debatable.  Reasonable minds could disagree.

[17]  *See* FED. R. CIV. P. 81(c)(1) ("These rules apply to a civil action after it is removed from a state court.").

[18]  FED. R. CIV. P. 15(a)(2) ("[A] party may amend its pleadings . . . with . . . the court's leave.  The court should

To be clear, the Court considers the Second Amended Complaint to be the operative complaint in this case. The Court will not strike that Complaint. The Court will determine whether it can constitutionally assert personal jurisdiction over Sparks Motors with respect to the claims in the Second Amended Complaint.

## Findings of Fact

To survive a motion to dismiss for lack of personal jurisdiction, the nonmoving party must make a *prima facie* showing that personal jurisdiction exists, "which is accomplished by pleading sufficient facts to support a reasonable inference that the defendant[] can be subjected to jurisdiction within the state."[19] When a Defendant raises a 12(b)(2) motion, the path for resolution of that motion depends in part on whether the Court chooses to hold a hearing or "instead relies on pleadings and affidavits."[20] If the Court chooses the latter approach, it "must look at the facts in the light most favorable to the nonmoving party and resolve all factual conflicts in favor of that party."[21] Because the Court has not held a hearing on this matter, the following factual findings are based on the record evidence, resolving all factual disputes in favor of Elite Autos and also taking all reasonable inferences in favor of Elite Autos.

---

freely give leave when justice so requires."); *see Beeck v. Aquaslide 'N' Dive Corp.*, 562 F.2d 537, 540 (8th Cir. 1977) (discussing how the decision of whether to allow or deny leave to amend lies with the discretion of the trial court, but that leave should be freely given unless the opposing party can show prejudice); *see also Lewis v. Challenge Mfg.*, No. 5:17-CV-6117-FJG, 2018 WL 10613263, at *2 (W.D. Mo. May 3, 2018) (finding that a plaintiff's amended complaint was not improper when the plaintiff had already amended his complaint in the state court proceedings).

[19] *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591-92 (8th Cir. 2011) (internal quotations omitted).

[20] *Johnson v. Arden*, 614 F.3d 785, 793-94 (8th Cir. 2010) (quoting *Epps v. Stewart Info. Serv. Corp.*, 327 F.3d 642, 646-47 (8th Cir.2003)); *K-V Pharm. Co.*, 648 F.3d at 592.

[21] *Id.* Of course, even in this scenario, a plaintiff seeking to establish that the Court has personal jurisdiction over a specific defendant still "carries the burden of proof and that burden does not shift to the party challenging jurisdiction." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (quoting *Epps*, 327 F.3d at 646-47)). And to resolve the dispute the Court will consider the pleadings as well as the affidavits and exhibits submitted to support or oppose the motion. *See K-V Pharm. Co.*, 648 F.3d at 591-92. However, it bears emphasizing that "jurisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing." *Epps*, 327 F.3d at 647.

Elite Autos is an Arkansas company, headquartered in Arkansas, that buys and sells custom and unique cars and trucks.[22]  Shelby Smith is its operator.[23]  Sparks Motors is a Utah company, headquartered in Utah,[24] that is also in the business of custom vehicles.  Sparks Motors does not conduct business in Arkansas.[25]  Sparks Motors does not advertise into Arkansas apart from what internet information is available about it online and accessible from any place.[26]  The record does not contain any evidence of Sparks Motors selling any other car to Arkansas companies or for use in Arkansas.

On April 29, 2019, Mr. Smith, on behalf of Elite Autos, contacted Dave Sparks, of Sparks Motors.[27]  Mr. Smith told Mr. Sparks that Elite Autos wanted to purchase a custom truck: a "new 2019 Ford F-550 Lariat 6x6 truck."[28]  The parties' only written agreement was a relatively sparse invoice, dated the same day as this initial contact by Elite Autos.[29]  It was prepared by Sparks Motors.[30]  The invoice listed the custom features of the truck, the total purchase price of $220,000, the payment terms, that completion was expected in eight to ten weeks from when the deposit was paid, and that there was a ninety-day limited warranty on the drivetrain components.[31]  Other than this invoice, there is no written contract or any other written agreement that explains the process for the truck construction, method of delivery, or resolution of defects.  There are, as will be

---

[22]  Pl.'s Second Am. Compl. (Doc. 16) ¶ 3.

[23]  Pl.'s Decl. (Doc. 21) ¶ 1.

[24]  Ex. 1 to Def.'s Am. Mot. to Dismiss (Doc. 18-1) ¶ 5.

[25]  *Id.* ¶ 6.

[26]  *Id.* ¶ 7.

[27]  Ex. 1 Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19-1) ¶ 3.

[28]  Pl.'s Second Am. Compl. (Doc. 16) ¶ 10.

[29]  Ex. 1 to Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19-1) at 6.

[30]  *Id.*

[31]  *Id.*  The invoice also stated that the "price estimate is to build the vehicle as depicted in the rendering provided" and "any changes or additional upgrades" would be "at additional cost."  *Id.*

discussed below, text messages between employees or agents of the two companies regarding some of these issues.[32]  And Elite Autos alleges, in a somewhat general manner, that there were also relevant oral representations made over the telephone.[33]

On April 30, 2019, Elite Autos made a down payment of $110,000.[34]  Elite Autos made two additional payments of $55,000 on June 4, 2019 and again on August 12, 2019.[35]  Around August 13, 2019, Mr. Sparks told Mr. Smith (of Elite Autos) that the title would be mailed to Elite Autos by the end of August 2019.[36]  Elite Autos never received the title.[37]  As for the truck itself, Mr. Sparks initially offered to have it delivered to Arkansas.[38]  Elite rejected this plan because of the estimated cost and time that Sparks Motors's transport would require.[39]  Instead, Elite Autos arranged for a third party to transport the truck from Utah to Arkansas at Elite Autos's expense.[40]  It is not entirely clear when the truck left Sparks Motors in Utah.  The best read of the evidence and allegations is that this occurred on August 13 or 14, 2019, after Elite Autos made its last installment payment.  Whatever the date, a third party hired by Elite Autos took possession of the truck in Utah.[41]  On August 15, 2019, the truck arrived in Arkansas at Elite Autos's showroom.[42]

When it arrived in Arkansas, the truck had defects.  After Elite Autos initially identified

---

[32] Ex. A to Pl.'s Decl. (Doc. 21-1); Ex. B to Pl.'s Decl. (Doc. 21-2); Ex. C to Pl.'s Decl. (Doc. 21-3); Ex. B to Def.'s Decl. (Doc. 22-2).

[33] Pl.'s Decl. (Doc. 21) ¶¶ 7, 9; Ex. A to Def.'s Decl. (Doc. 22-1) ¶ 3; Pl.'s Second Am. Compl. (Doc. 16) ¶¶ 24, 35.

[34] Pl.'s Second Am. Compl. (Doc. 16) ) ¶ 11.

[35] *Id.* ¶¶ 13, 14.

[36] *Id.* ¶ 15; Ex. 1 to Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19-1) ¶ 8.

[37] Pl.'s Second Am. Compl. (Doc. 16) ¶ 36; Ex. 1 to Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19-1) ¶ 27.

[38] Pl.'s Decl. (Doc. 21) ¶ 2.

[39] *Id.*

[40] *Id.* ¶ 2-3.

[41] *Id.* ¶ 3-4.

[42] *Id.* ¶ 3.

some of the problems, there was a large amount of communication between Elite Autos's Mr. Smith and Sparks Motors's Store Manager, Hans Peterson, regarding these identified problems as well as problems that continued to develop with the truck.[43]   This communication took place through text messages and phone calls.[44]   (Mr. Sparks was included on some of these text messages.[45])  Many, if not all, of the text messages have been submitted to the Court, and the Court has reviewed them.[46]  A number of the problems were acknowledged by both parties very shortly after delivery.[47]

Mr. Peterson initially offered to return the purchase price of the truck to Elite Autos and reclaim the truck.[48]  In a text message on August 15, 2019, the same day the truck arrived at Elite Autos, he told Mr. Smith, "[w]e can throw a max of $5k at it as a courtesy to help you do whatever you need to do.   Otherwise we'll bring you a refund check and come pick the truck up immediately."[49]  Mr. Smith did not take Mr. Peterson up on the offer of a refund.  After texting Mr. Peterson about the continuing fuel leak and Elite Autos's inability to pinpoint the problem, Mr. Smith explained that Elite Autos was "gonna have to drop tank and start trouble shooting."[50] He told Mr. Peterson:

---

[43]  Pl.'s Decl. (Doc. 21); Def.'s Decl. (Doc. 22).

[44]  Pl.'s Decl. (Doc. 21); Def.'s Decl. (Doc. 22).

[45]  Ex. B to Pl.'s Decl. (Doc. 21-2).

[46]  Ex. B to Pl.'s Decl. (Doc. 21-2).  During the course of communication, Mr. Peterson was located in Utah.  Mr. Sparks was also located in Utah, though for some of the time he was on vacation.  Ex. A to Def.'s Decl. (Doc. 22-1) ¶ 4.

[47]  Pl.'s Decl. (Doc. 21) ¶ 5; Ex. A to Pl.'s Decl. (Doc. 21-1) at 1; Ex. B to Pl.'s Decl. (Doc. 21-2) at 9; Ex. B to Def.'s Decl. (Doc. 22-2) at 1.

[48]  Ex. A to Def.'s Decl. (Doc. 22-1) ¶ 9; Ex. B to Def.'s Decl. (Doc. 22-2) at 1.

[49]  Ex. A to Def.'s Decl. (Doc. 22-1) ¶ 9; Ex. B to Def.'s Decl. (Doc. 22-2) at 1.

[50]  Ex. B to Def.'s Decl. (Doc. 22-2) at 1; Ex. A to Pl.'s Decl. (Doc. 21-1) at 4.

> I'm sorry but $5k is not gonna cover all these problems. If it was just the paint only then I would say I would say I'd take the $5k and just deal with it [and] absorb the rest of the cost myself but the simple matter is, I shouldn't HAVE to be dealing with any of this. Please have Dave call me at his convenience so we can get this figured out[.][51]

This text message suggests that Mr. Smith was, at this time, focused on fixing the truck (and having Sparks Motors pay for the repairs) as opposed to returning the vehicle to Sparks Motors for a refund. Mr. Smith's text to Mr. Peterson the next day, August 16, 2019, adds weight to this conclusion.

> Sent this to Dave [Sparks] but felt the same needed to be said to you, so please read….
>
> Hey bud,
>
> Things are going better today. If I was a little harsh yesterday I do want to apologize. Just been a little stressed with getting this thing ready for the big show next week and the issues just all hit me at once when I had virtually no time to trouble shoot with everything else we had going. My complaints were valid, BUT, it's always better to just keep calm and find a solution rather than get worked up. My bad on that part[.] [Emoji excluded]
>
> I do want to compliment on how good the quality is on all the suspension, frame and fab work. It really is first class and I'm not just trying to kiss ass. It's some of the best I've seen.
>
> After getting the fuel situation fixed today my mind is more clear and overall, other than the body issues and paint issues and a few electronic glitches, which we plan to fix, I am pretty happy with it. Truck rides great, handles better than expected and just has a HUGE wow factor when you see one going down the road for the first time. I've got my fingers crossed that it tows my boat just as good as it drives.
>
> So, again, please accept my apology if my complaints were too harsh yesterday. We all have our good days and bad days and I feel the way I approached it was probably a little harsh.

---

[51]  Ex. B to Def.'s Decl. (Doc. 22-2) at 1; Ex. A to Pl.'s Decl. (Doc. 21-1) at 4.

> We are currently working on improving some of the finish work so
> it will represent your company a little closer to what you deserve,
> and when we get back from the show, we are going to tackle
> correcting the body and paint to as close to perfect as we can get it.[52]

The next text message in the record is from August 25, 2019, which is nine days later.  On that day, the truck's transmission failed while Mr. Smith was in Missouri, leaving him and the truck stranded there.[53]  As it turns out, Sparks Motors later acknowledged that it had known of the significant defect that led to the failure of the transmission when Sparks Motors released the truck to Elite Autos's third party agent in Utah.[54]  Sparks Motors said it simply did not have enough time to address the problem before the pickup date.[55]  The defect was not disclosed to Elite Autos.[56]

While Sparks Motors attempted to get help to transport Mr. Smith and the truck back to Arkansas, ultimately Mr. Smith had an Elite Autos employee pick him up and arranged for a third party to transport the truck to Elite Autos's place of business at Elite Autos's expense.[57]  At one point, it appeared as if Sparks Motors was going to fly someone out to Arkansas to fix the problems with the truck.[58]  That never occurred.[59]  Instead, the parties arranged for Sparks Motors to

---

[52] Ex. B to Def.'s Decl. (Doc. 22-2) at 1; Ex. A to Pl.'s Decl. (Doc. 21-1) at 4-6.

[53] Pl.'s Decl. (Doc. 21) ¶ 12; Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19-1) at ¶ 18.

[54] Pl.'s Decl. (Doc. 21) ¶ 5; Ex. B to Pl.'s Decl. (Doc. 21-2) at 9; Ex. A to Def.'s Decl. (Doc. 22-1) ¶ 9; Ex. B to Def.'s Decl. (Doc. 22-2) at 1.

[55] Ex. A to Def.'s Decl. (Doc. 22-1) ¶ 9; Ex. B to Def.'s Decl. (Doc. 22-2) at 1.

[56] There is dueling evidence as to whether and how the defect was disclosed to Elite Autos.  There are texts discussing that Sparks Motors knew about the transmission defect prior to the truck being picked up in Utah by Elite Autos's third party agent.  There are also texts discussing whether and how much information was shared with Elite Autos about this defect prior to the truck being picked up.  Ex. 1 to Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19-1) ¶ 7; Ex. A to Pl.'s Decl. (Doc. 21-1) at 15-16; Ex. B to Pl.'s Decl. (Doc. 21-2) at 13-14, 21-22; Ex. C to Pl.'s Decl. (Doc. 21-3) at 8-9.  For purposes of this Motion, taking the record in the light most favorable to Elite Autos, the Court concludes that (1) Sparks Motors identified to Elite Autos that this was a problem during the initial work on the truck, but (2) Sparks Motors did not tell Elite Autos that the truck was being delivered without the identified problem having been fixed.  Ex. B to Pl.'s Decl. (Doc. 21-2) at 9, 13-14, 21-22; Ex. C to Pl.'s Decl. (Doc. 21-3) at 8-9.

[57] Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19-1) ¶¶ 20-21, 28.

[58] Pl.'s Decl. (Doc. 21) ¶ 11; Ex. B to Pl.'s Decl. (Doc. 21-2) at 1.

[59] Pl.'s Decl. (Doc. 21) ¶ 12; Ex. B to Pl.'s Decl. (Doc. 21-2) at 3, 23-24; Pl.'s Second Am. Compl. (Doc. 16) ¶ 34.

transport the truck from Elite Autos in Arkansas to Sparks Motors in Utah.[60]

On September 6, 2019, a Sparks Motors employee—Bud Austin—picked up the truck from Elite Autos and transported it back to Sparks Motors in Utah.[61]  Mr. Austin was wearing a shirt with Sparks Motors logo on it.[62]  Mr. Austin was driving a truck with a Sparks Motors logo on it.[63] Mr. Austin was someone who routinely delivered and picked up vehicles from across the country for Sparks Motors.[64]  There is no evidence to show that Mr. Austin discussed the fate of the truck, potential repairs to the truck, or a potential refund with anyone at Elite Autos.  He simply picked up the truck and returned it to Utah.

Whether the transport of the truck back to Utah was for repairs or for a return and refund is debated by the parties.  In its Second Amended Complaint, Elite Autos had alleged that, prior to the truck being picked up in Arkansas, "it was [Mr.] Smith's understanding that Sparks Motors would at Elite's option either (1) repair all non-conformities to Elite's satisfaction and return the truck to Elite in Arkansas; or (2) fully refund Elite's purchase money and related expenses."[65]  In Mr. Smith's declaration, he seems to state the same, although he also suggests that it was clear by the time the truck left Arkansas that Elite Autos was only interested in a refund, not in potential repairs.[66]  The record—particularly the text messages provided in response to the Court's request for supplemental declarations—does not bear out the allegations and statements made by Elite

---

[60]  Ex. A to Def.'s Decl. (Doc. 22-1) ¶¶ 18-20, 23; Pl.'s Decl. (Doc. 21) ¶ 12; Pl.'s Second Am. Compl. (Doc. 16) ¶ 34.

[61]  Ex. A to Def.'s Decl. (Doc. 22-1) ¶ 19; Ex. 1 to Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19-1) ¶ 25.

[62]  Ex. 1 to Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19-1) ¶ 25.

[63]  *Id.*

[64]  Ex. A to Def.'s Decl. (Doc. 22-1) ¶ 19; Ex. 1 to Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19-1) ¶ 25.

[65]  Pl.'s Second Am. Compl. (Doc. 16) ¶ 33.

[66]  Ex. 1 to Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19-1) ¶¶ 22, 24.

Autos and Mr. Smith.

On August 25, 2019, when Mr. Smith got stranded with the truck in Missouri, Mr. Peterson explained that he wanted to pick up the truck "so we can get this fixed and back to [Elite Autos] ASAP."[67]   After some intervening texts, Mr. Smith ultimately responded that "I think with the previously discussed problems and now this we would be best to unwind this deal."[68]  Mr. Smith then explained why he wanted to return the truck for a refund instead of repairs.[69]  In reply, Mr. Peterson was very clear that he could not himself authorize a refund:

> I'm sorry for all the troubles[.]  I can't make any decisions on unwinding the deal but I will get things in motion to immediately resolve the problems with the truck so that regardless of what happens with the deal, the truck will be fixed correctly in the meantime.  We'll arrange transportation of the truck to our shop for repairs and get back to you in a few days[.][70]

Mr. Smith was not content with this.  He reminded Mr. Peterson of his offer from August 15, 2019, discussed *supra*, for a return and refund.[71]  He asked Mr. Peterson to "talk to Dave and let me know what he says."[72]  While Mr. Peterson said he would do that,[73] there is no evidence of any subsequent text message suggesting what Mr. Sparks said in response.  A little while later, Mr. Smith repeated his request, stating that he "just feel[s] it's best for all involved that the truck comes back to you guys, I get my money back and you guys can address the issues and deliver the truck to one of the other people you have interested."[74]  Again, Mr. Peterson said only that he "will get

---

[67]   Ex. B to Pl.'s Decl. (Doc. 21-2) at 3.

[68]   *Id.* at 4-5.

[69]   *Id.* at 5-6.

[70]   *Id.* at 7-8.

[71]   *Id.* at 8.

[72]   *Id.*

[73]   *Id.*

[74]   *Id.* at 10.

with Dave and get back to [Mr. Smith], thanks."[75]   And again there is no evidence of any subsequent text message suggesting what Mr. Sparks said in response.   The record shows Mr. Smith asking a few more times about a refund and again getting no substantive response by text.[76]

On August 28, 2019, Mr. Smith asked Mr. Peterson "where do we stand on my truck?"[77] Mr. Peterson explained that he "want[ed] to fix it and get it back to [Elite Autos] ASAP" and that "he was fighting for [Elite Autos] to keep it, but get it back fixed to our actual standard."[78]   Mr. Smith responded as follows:

> I don't want it[.]  I have no interest in keeping it[.]  Zero[.]  Best for all involved to just refund what I paid you.  At this point I'm not asking you to reimburse me for any other expenses I have incurred as far as shipping it from Utah, getting it shipped from MO to AR, the work we did on it to stop the file leak or any of the wetsanding and buffing we did to get it somewhat acceptable for it to be shown . . . .  We are best to unwind the deal and both just take our los[s]es and move on.[79]

Mr. Peterson did not say the deal could be unwound and a refund processed.  Indeed, Mr. Peterson said only that "[o]nce the truck has arrived here [in Utah] you will be contacted by someone with higher authority than I have and can make final decisions.  I'm sorry for the issues you've had, you've been more than understanding [and] great to work with.  I am now stepping out of this deal and will let those with more power handle this."[80]   On September 4, 2019, Mr. Smith texted with Sparks Motors's attorney.[81]   Mr. Smith once again demanded a refund.[82]   There is no evidence of

---

[75]  *Id.* at 10.

[76]  *Id.* at 21-22; Ex. C to Pl.'s Decl. (Doc. 21-3) at 8-9; Ex. B to Def.'s Decl. (Doc. 22-2) at 2.

[77]  Ex. B to Def.'s Decl. (Doc. 22-2) at 2.

[78]  *Id.* at 2.

[79]  *Id.* at 2.

[80]  *Id.* at 3.

[81]  Pl.'s Decl. (Doc. 21) ¶ 6; Ex. C to Pl.'s Decl. (Doc. 21-3).

[82]  Ex. C to Pl.'s Decl. (Doc. 21-3) at 9.

a response.[83]

This was the state of play when the truck was picked up by Sparks Motors from Elite Autos on September 6, 2019.  After this point, the written evidence (text messages) shows both parties concentrating on repairs as opposed to a refund and unwinding of the deal.[84]  On September 9, 2019, after the truck made it to Utah, Mr. Smith texted Mr. Peterson: "Can someone let me know the plan."[85]  Mr. Peterson said they were working on the transmission issue.[86]  On September 10, 2019, Mr. Smith asked about all the other identified issues.[87]  Mr. Peterson said they were going to "fix[] them all."[88]  On September 17, 2019, Mr. Smith texted "I see in recent videos my truck is just sitting outside?  I thought it was having all the paint corrected while waiting on the drivetrain parts?"[89]  Mr. Peterson responded "[t]hat's not your truck."[90]  Mr. Smith replied "Ok.  Any current progress photos on my truck?"[91]  He didn't get a substantive answer; Mr. Peterson said he was

---

[83]  In Mr. Smith's declaration, after describing the August 15, 2019 refund offer, he states that "[o]n more than one phone call . . . Peterson similarly offered to allow me to return the truck and refund the money I paid for the truck, if I was dissatisfied with it."  Pl.'s Decl. (Doc. 21) ¶ 9.  Mr. Smith does not say when these oral statements were made, whether on August 15, 2019, or later.  Without more precise information, Mr. Smith's declaration does not and cannot controvert the extensive written text messages showing the course of dealing between Mr. Smith and Mr. Peterson.  From August 25, 2019 and onward, Mr. Peterson was clear that he did not have the authority to unwind the deal.  Ex. B to Def.'s Decl. (Doc. 22-2) at 3; Ex. A to Pl.'s Decl. (Doc. 21-1) at 16.  And the text messages show Mr. Smith repeatedly asking for a refund, but never being given an answer.  Ex. B to Pl.'s Decl. (Doc. 21-2) at 5, 8, 10, 21-22; Ex. C to Pl.'s Decl. (Doc. 21-3) at 8-9; Ex. B to Def.'s Decl. (Doc. 22-2) at 2.

[84]  Ex. B to Def.'s Decl. (Doc. 22-2) at 3-4.  Mr. Smith states in one of his declarations that "[s]ubsequent to September 6, 2019, counsel for Sparks Motors called to tell me that Sparks Motors did not have the money to refund Elite's $220,000 purchase price."  Ex. 1 to Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19-1) ¶ 26.  The precise date this occurred is not clear.  And it is not clear if this was the reason the parties, including Elite Autos, focused on repairs.

[85]  Ex. B to Def.'s Decl. (Doc. 22-2) at 3.

[86]  *Id.*

[87]  *Id.*

[88]  *Id.*

[89]  *Id.*

[90]  *Id.*

[91]  *Id.*

"not working today" because he was having a baby.[92]   After a few more update requests on September 26 and 28, Mr. Peterson told Mr. Smith that the "[f]ender tailgate gap is fixed, front fenders should be ready for paint, bedsides should be ready for paint as well."[93]   Mr. Smith responded, "[w]hen do we foresee it being ready to come back?  Been there almost a month now."[94] The record shows several more check-ins like this up through the beginning of October 2019, with Mr. Smith clearly expressing a desire for the repairs to be finished and for the truck to be returned to Elite Autos.[95]

At some point after early October 2019, the parties' relationship deteriorated further.  There is no evidence of text messages or communication beyond early October 2019.  And neither party suggests what happened after that time.  The best the Court can surmise is that (1) Elite Autos got frustrated about the continuing delays in repairs and once again took the position that it wanted a refund and unwinding of the deal, and (2) Sparks Motors took the position that Elite Autos is not entitled to a refund and unwinding of the deal.  In any event, Sparks Motors still has the truck and has refused to refund Elite Autos's money.[96]   It is unclear if the truck is completely repaired at this point.  It is unclear if Sparks Motors has offered to deliver the truck to Elite Autos.  And it is unclear if Elite Autos has formally refused to accept the repaired truck, although the Court surmises this is the case based on the prior course of dealing between the parties and the present lawsuit.

## **Legal Standard**

In a diversity case, a federal district court can assert personal jurisdiction over a defendant

---

[92]   *Id.*

[93]   *Id.* at 3-4.

[94]   *Id.* at 4.

[95]   *Id.*

[96]   Ex. 1 to Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19-1) ¶¶ 25-27.

to the extent allowed by the long-arm statute of the forum state and the Due Process Clause.[97]  The Arkansas long-arm statute authorizes personal jurisdiction to the fullest extent possible consistent with the Due Process Clause.[98]  Accordingly, the question here is whether an assertion of personal jurisdiction over Sparks Motors would violate the Due Process clause.  "Due process requires 'minimum contacts' between [a] non-resident defendant and the forum state such that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"[99]  Specifically, there must exist "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."[100]  "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction as a result of random, fortuitous, or attenuated contacts . . . ."[101]

While it is true that the "interests of the forum State and of the plaintiff in proceeding with the cause in the plaintiff's forum of choice" are among the "variety of interests" that "a court must consider," the Supreme Court has recently reaffirmed (in an 8-1 opinion) that "the 'primary concern' is 'the burden on the defendant.'"[102]  And in that opinion the Court made clear that assessing the burden on the defendant is more than just a ho-hum question about the practical difficulties a defendant might face in litigation away from home:

---

[97]  *K-V Pharm. Co.*, 648 F.3d at 592.

[98]  ARK. CODE ANN. § 16-4-101.  *See Davis v. St. John's Health Sys., Inc.*, 348 Ark. 17, 71 S.W.3d 55, 58 (2002); *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073 (8th Cir. 2004).

[99]  *Dever*, 380 F.3d at 1073 (referencing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980)).

[100]  *Romak USA, Inc. v. Rich*, 384 F.3d 979, 984 (8th Cir. 2004) (internal quotation omitted).

[101]  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation omitted).

[102]  *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017).

> Assessing this burden obviously requires a court to consider the practical problems resulting from litigating in the forum, but it also encompasses the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question.  As we have put it, restrictions on personal jurisdiction "are more than a guarantee of immunity from inconvenient or distant litigation.  They are a consequence of territorial limitations on the power of the respective States." *Hanson v. Denckla*, 357 U.S. 235, 251, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).  "[T]he States retain many essential attributes of sovereignty, including, in particular, the sovereign power to try causes in their courts. The sovereignty of each State . . . implie[s] a limitation on the sovereignty of all its sister States." *World-Wide Volkswagen*, 444 U.S., at 293, 100 S.Ct. 559.  And at times, this federalism interest may be decisive.  As we explained in *World-Wide Volkswagen*, "[e]ven if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment." *Id.*, at 294, 100 S.Ct. 559.[103]

The Eighth Circuit has a five-part test for measuring minimum contacts: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties."[104]  But consistent with the Supreme Court's just-discussed exposition of the law, the Eighth Circuit has instructed that "[t]he first three factors are the most important."[105]

The amount of minimum contacts necessary to satisfy due process is different for general jurisdiction and specific jurisdiction.  General jurisdiction is the power to adjudicate *any* claim

---

[103] *Id.* at 1780-81.

[104] *Miller v. Nippon Carbon Co.*, 528 F.3d 1087, 1091 (8th Cir. 2008) (quoting *Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 819 (8th Cir. 1994)).

[105] *Federated Mut. Ins. Co. v. FedNat Holding Co.*, 928 F.3d 718, 720 (8th Cir. 2019).

involving a particular defendant.[106]   A court has general jurisdiction over a defendant who has "continuous and systematic" contacts with the forum state.[107]   Elite Autos acknowledges that Sparks Motors does not have such contacts with Arkansas and thus this Court does not have general jurisdiction over Sparks Motors.   Even where general jurisdiction is lacking, a court can have specific jurisdiction over a defendant.   Elite Autos says that the Court has specific jurisdiction over Sparks Motors in this case.

The Supreme Court has repeatedly emphasized that "[s]pecific jurisdiction is very different" [108] from general jurisdiction:

> In order for a state court to exercise specific jurisdiction, the suit must arise out of or relate to the defendant's contacts with the forum. In other words, there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.   For this reason, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.[109]

"Specific jurisdiction over a defendant is exercised when a state asserts personal jurisdiction over a nonresident defendant that 'has purposefully directed [its] activities at [the forum state's] residents' in a suit that 'arises out of' or 'relates to' these activities."[110]   "Specific jurisdiction is proper 'only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state, meaning that the defendant purposely directed its activities at the forum state and the claim arose out of or relates to those activities.'"[111]

---

[106]  *Miller*, 528 F.3d at 1091.

[107]  *Johnson*, 614 F.3d at 794.

[108]  *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780.

[109]  *Id.* at 1780-81 (cleaned up) (internal quotations and citations omitted).

[110]  *Johnson*, 614 F.3d at 794 (quoting *Lakin v. Prudential Sec., Inc.*, 348 F.3d 704, 707 (8th Cir. 2003)).

[111]  *Id.* at 795 (quoting *Steinbuch v. Cutler*, 518 F.3d 580, 586 (8th Cir. 2008)).

The Court wishes to emphasize two additional things about the specific jurisdiction analysis.  First, the triggering relationship between the defendant and the forum state "'must arise out of contacts that the defendant *himself* creates with the forum State,' and [the proper] 'analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'"[112]  Second, whether or not a defendant has physically been in the forum state is not dispositive of the specific jurisdiction question.  It certainly is relevant (and maybe highly relevant) to the analysis.  But it is not dispositive.  Even where a defendant has never been to the forum state, specific jurisdiction over that defendant can sometimes be constitutionally exercised.  The Eighth Circuit said this in *Wells Dairy, Inc. v. Food Movers International, Inc.*[113] And the Supreme Court has said as much by way of a hypothetical in *World-Wide Volkswagen Corp. v. Woodson*.[114]  On the flip side, however, even if a defendant enters a forum state and his visit is related to the activity that gives rise to a subsequent legal claim, that does not automatically give rise to specific jurisdiction.  The Eighth Circuit made this clear in *Austad Co. v. Pennie & Edmonds*.[115]

## Conclusions of Law

In analyzing whether this Court has specific jurisdiction over Sparks Motors, the Court considers all of the five factors set forth by the Eighth Circuit.  But it does so with an emphasis on

---

[112] *Federated Mut. Ins. Co.*, 928 F.3d at 720 (quoting *Walden v. Fiore*, 571 U.S. 277, 284-85 (2014)).

[113] 607 F.3d 515, 519-20 (8th Cir. 2010).

[114] 444 U.S. at 297-98 (1980) ("Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.  The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.").

[115] 823 F.2d 223 (8th Cir. 1987).

"the nature and quality of the [defendant's] contacts" with the forum state and their "source and connection to the cause of action."[116]  For some of the claims in this case, an additional factor is added to the mix.  Elite Autos requests that, for claims of an intentional tort, the Court also consider the *Calder* effects test.[117]  The Court will do so.  However, it is important to note that the Eighth Circuit has expressly "construe[d] the *Calder* effects test narrowly . . . ."[118]  The Eighth Circuit treats "the *Calder* test merely as an additional factor to consider when evaluating a defendant's relevant contacts with the forum state."[119]  Moreover, it is only fair to acknowledge that the facts of *Calder* and its progeny in the Eighth Circuit—particularly the nature, type, and frequency of conduct by a defendant directed at a forum state—are not a tight fit with the facts in the case at bar.

The Court concludes that it cannot constitutionally assert specific jurisdiction over Sparks Motors in this matter.  When Elite Autos initially reached out to Mr. Sparks to buy a truck, Sparks Motors was not conducting business in Arkansas.  There is no record evidence that Sparks Motors did anything to precipitate the inquiry from Elite Autos.  There is no record evidence or allegation that Sparks Motors had ever sold another vehicle into Arkansas.  There is no record evidence that Sparks Motors was trying to sell vehicles into Arkansas.  There is no record evidence that Sparks Motors was advertising in a way that was directed towards Arkansas or Arkansans.  It was, for all

---

[116] *Miller*, 528 F.3d at 1091 (8th Cir. 2008) (quoting *Lakin*, 348 F.3d at 712).

[117] Pl.'s Resp. in Opp'n to Def.'s Am. Mot. to Dismiss (Doc. 19) at 10-15.  *See Dakota Industries v. Dakota Sportswear*, 946 F.2d 1384, 1390-91 (8th Cir. 1991) ("In *Calder* . . . , the Supreme Court made a sharp distinction between mere untargeted negligence and intentional, and allegedly tortious, actions aimed expressly at the forum state. . . .  The Supreme Court thus approved an "effects" test that allows the assertion of personal jurisdiction over non-resident defendants whose acts are performed for the very purpose of having their consequences felt in the forum state.") (internal quotations and citations omitted).  *See also Johnson*, 614 F.3d at 796-97.

[118] *Johnson*, 614 F.3d at 797.

[119] *Id.* at 796-97.  The specific holding of *Johnson* was that "absent additional contacts, mere effects in the forum state are insufficient to confer personal jurisdiction."  *Id.* at 797.

intents and purposes, entirely random and fortuitous that Elite Autos was from Arkansas and wanted a truck.[120]

The contract (really, just an invoice) was written by Sparks Motors in Utah and provided to Elite Autos by email, mail, or text. All related communications between Sparks Motors and Elite Autos was conducted predominately, if not entirely, by cellular phone. At no time did an agent of Sparks Motors enter Arkansas to negotiate any aspect of the contract or sale. Sparks Motors did not drive to Arkansas to drop off the truck; instead, Elite Autos arranged for a third party to pick it up in Utah at the expense of Elite Autos.[121]

It is true that Sparks Motors knew it was selling a vehicle to a company located in Arkansas. But that is simply based on the fortuity that Elite Autos happened to be in Arkansas. Elite Autos could have been located anywhere. This was a one-off sale initiated by Elite Autos. There is no allegation or evidence that this was intended to be part of an ongoing repeat business relationship between Sparks Motors and Elite Autos. And there was no evidence that Sparks Motors has ever sold other vehicles into Arkansas or to Elite Autos. On these facts, the mere knowledge that the vehicle was going to Arkansas is not enough to say that Defendants purposefully directed activity toward Arkansas or purposefully availed themselves of the privilege of conducting activities

---

[120] There is a fairly vague allegation in Elite Autos's Second Amended Complaint that "Sparks Motors advertises nationally, including but not limited to the television show 'Diesel Brothers' on the Discovery Channel . . . ." Pl.'s Second Am. Compl. (Doc. 16) ¶ 4. This allegation was not developed any further or supported by any evidence. But the Court surmises that Elite Autos is highlighting that Mr. Sparks is a cast member of the show "Diesel Brothers" and that people in Arkansas could theoretically find out about him and Sparks Motors that way. This allegation does not change the equation. Sparks Motors was not advertising in Arkansas specifically and the show was not geared to Arkansas or Arkansans. Sparks Motors was not availing itself of the benefits and protections of Arkansas law. The most contact with the forum state that can be attributed to Sparks Motors is a passive website that could be accessed from anywhere in the world.

[121] The fact that the parties never discussed or identified where "delivery" would occur as a legal matter does not change the fact that the car left Sparks Motors's possession when it was taken off the Utah shop lot by an agent for Elite Autos. Likewise, the fact that Sparks Motors had at one point offered to bring the truck to Elite Autos in Arkansas is of little moment compared to what actually occurred. Whether or not an actual delivery trip to Arkansas by Sparks Motors would have been enough to create specific jurisdiction under *Papachristou v. Turbines Inc.*, the mere contemplation of such trip is certainly not enough. 902 F.2d 685, 686 (8th Cir. 1990).

within Arkansas.  Otherwise, there's no real limiting principle aside from foreseeability, and we know from controlling caselaw that minimum contacts require more than this type of foreseeability.[122]

Consider a local used car dealer in Fairbanks, Alaska and a visiting couple from New York. If the New York couple show up on the lot, tell the Fairbanks, Alaska dealer that they want to buy a car to take home to New York, and then buy a car, has the used car dealer in Fairbanks, Alaska really exposed himself to being haled into court in New York if the car allegedly has a defect?  No, he has not.  Maybe that's an extreme example and maybe our case is not all the way on that side of the spectrum.  But our case is much closer to this hypothetical than it is to the Eighth Circuit cases concluding specific jurisdiction exists, such as *Wells Dairy*[123] or *Dakota Industries*.[124]  In Eighth Circuit terms, the case at bar falls of the *Austad* side of the spectrum.[125]

The parties have not pointed to, and the Court has not found, a controlling Eighth Circuit case that has addressed a case sufficiently similar to the one at bar.  There is, however, a 2008 case from the Ninth Circuit that is fairly (although not completely) analogous: *Boschetto v. Hansing*.[126] The Court finds the analysis in that case persuasive and readily transferable to the facts of the case at bar.  Any differences between the two cases are differences without legal distinctions.  Just as

---

[122] *See World-Wide Volkswagen Corp.*, 444 U.S. at 296 ("If foreseeability were the criterion, a local California tire retailer could be forced to defend in Pennsylvania when a blowout occurs there, *see Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc.*, 239 F.2d 502, 507 (CA4 1956); a Wisconsin seller of a defective automobile jack could be haled before a distant court for damage caused in New Jersey, *Reilly v. Phil Tolkan Pontiac, Inc.*, 372 F. Supp. 1205 (N.J. 1974); or a Florida soft-drink concessionaire could be summoned to Alaska to account for injuries happening there, *see Uppgren v. Executive Aviation Services, Inc.*, 304 F. Supp. 165, 170-171 (Minn.1969).  Every seller of chattels would in effect appoint the chattel his agent for service of process.  His amenability to suit would travel with the chattel.").

[123] 607 F. 3d 515.

[124] 946 F. 2d at 1391.

[125] *Contra Dakota Industries*, 946 F.2d at 1391 ("We believe that this case falls somewhere between *Asahi* and *Austad* on one hand and *Calder* on the other, but, in our view, it is somewhat closer to *Calder*.").

[126] 539 F. 3d 1011 (9th Cir. 2008).

the Due Process Clause prevented a federal district court in California from asserting personal jurisdiction over a Wisconsin car dealer who completed a one-time auto sale to a California buyer (at the behest of the buyer), due process prevents this Court from asserting jurisdiction over Sparks Motors based on a one-time sale of a truck to an Arkansas buyer (at the behest of the Arkansas buyer).[127]

Elite Autos makes much of the fact that Sparks Motors sent an employee to retrieve the truck in Arkansas after Elite Autos identified several problems with the truck.  But this one-day trip to Arkansas seems most analogous to the three-day trip to the forum state in *Austad*.  Although the trip has some connection to the events at issue in this litigation, and should be considered in the analysis, it is not dispositive of the purposeful direction or purposeful availment question.  The mere fact that Sparks Motors retrieved the vehicle from the buyer in a one-time sale gone bad does not change the foregoing analysis.  Again, the buyer could have been anywhere—it was random and fortuitous that the buyer was in Arkansas.[128]

---

[127] *See also Masko v. Family RV Ctr.*, No. 4:05CV2593, 2006 WL 2077034, at *1 (N.D. Ohio July 24, 2006).

[128] Counts I-VI and most of Counts VIII and IX are expressly based on conduct completed before the single-day trip to Arkansas to pick up the vehicle.  *See* Pl.'s Second Am. Compl. (Doc. 16).  All of Defendant's conduct at issue in those allegations pretty clearly occurred in Utah.  Count VII (Conversion) and a small portion of Counts VIII (Fraud) and IX (Deceptive Trade Practices) are slightly different in this regard.  *See id.*  For example, the factual chain of events that underlie the conversion claim (and a small part of the fraud and deceptive trade practices claims) includes a Sparks Motors employee driving into Arkansas to take possession of the truck and bring it back to Utah.  *See supra* text at p. 10.  This makes for something of a closer call.  But it doesn't ultimately persuade the Court that, in all the circumstances of this case, an assertion of jurisdiction over a Utah company for essentially a one-off vehicle sale gone wrong is consistent with the Due Process Clause.

Elite Autos's Complaint does not expressly allege whether the conversion, fraud, and deceptive trade practices occurred in Arkansas (before or during pickup of the vehicle) or in Utah (after repairs were attempted).  Pl.'s Second Am. Compl. (Doc. 16) at 11-14.  To the extent that Elite Autos is suggesting that Sparks Motors took possession of the truck in Arkansas under the false pretense of unwinding the sale and refunding the purchase price, the text messages simply don't support that allegation (even taking the record and all reasonable inferences therefrom in favor of Elite Autos).  The text messages show that Sparks Motors did not tell Elite Autos that it was picking up the car as part of an agreement to refund the purchase price and unwind the deal.  If anything, the text messages show Elite Autos acquiescing to the truck being repaired in Utah for eventual return to Elite Autos.  *See supra* text at pp. 10-14.  Any potential conversion, fraud, or deceptive trade practices related to Sparks Motors's retrieval and retention of the truck occurred in Utah after repairs were attempted and the parties' relationship deteriorated further.  *See supra* text at p. 14.  Claims regarding such conduct are, for all intents and purposes, part and parcel of the dispute over the one-off vehicle sale.  The fact that Sparks Motors picked up the vehicle in

22

In sum, the first three factors of the relevant five-factor test strongly suggest that it would be unconstitutional to assert personal jurisdiction over Sparks Motors in the circumstances of this case.  Factor four—the interest of the forum state in providing a forum for its residents—weighs slightly in favor of Elite Autos.  The Court can't say that Arkansas has no interest in providing a forum for its residents to resolve such disputes.  On the other hand, given the one-off nature of this sale, the lack of directed advertising to Arkansas customers, and the initiation of the sale by the Arkansas company, the Court also cannot say that Arkansas has a particularly compelling interest in providing a forum for its plaintiff to resolve this dispute.  As for factor five—the convenience of the parties—it's a tie.  Still, because the Supreme Court has made clear that "the primary concern" of this due process analysis is "the burden on the defendant," a tie goes to the Defendant.[129]

As Elite Autos suggests, at least some of the claims presented are intentional torts for which the Court must consider a sixth factor: the *Calder* effects test.  It is only fair to acknowledge that the effects of Sparks Motors's conduct would be felt in Arkansas and that Sparks Motors knew the effects would be felt in Arkansas.  But at most this is a pale reflection of the nature and type of effects *Calder* addressed.  As the Eighth Circuit explained in *Dakota Industries*, the *Calder* decision "approved an 'effects' test that allows the assertion of personal jurisdiction over non-resident defendants whose acts 'are performed for the very purpose of having their consequences felt in the forum state.'"[130]  In *Calder*, the whole point of the allegedly libelous news article in the National Enquirer was to create a negative effect in California on a California resident.  And the

---

Arkansas simply reflects the fact that the unhappy buyer (Elite Autos) happened to be from Arkansas and brought the truck there.  If the buyer lived somewhere else, Elite Autos would have picked up the truck somewhere else.  This fortuity does not provide the needed hook for specific jurisdiction over Sparks Motors.

[129] *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780.

[130] 946 F.2d at 1390-91 (quoting *Brainerd v. Governors of the Univ. of Alberta*, 873 F.2d 1257, 1260 (9th Cir. 1989)).

National Enquirer had a huge circulation in California, magnifying the effects. Our case is different. The alleged intentional torts in our case were incidental to the one-off auto sale. They were not performed for the very purpose of having their consequences felt in Arkansas, certainly not in the way *Calder* meant this phrase. That is not to say the *Calder* effects test is entirely irrelevant here. It is simply to say that, to the extent the effects test from *Calder* favors Elite Autos, it does so very slightly and does not overcome the factors that favor Sparks Motors.[131]

Elite Autos relies almost exclusively on two district court cases from this District. Obviously, they are not controlling on this Court. Nonetheless, because they might be persuasive, the Court has reviewed them closely. In *Ground Connection, LLC v. Ground Connection Techs., LLC*, the defendants' physical contacts with Arkansas were more extensive than in our case, there was supposed to be an ongoing business relationship between the defendants and the Arkansas plaintiffs in Arkansas, and the very purpose of the alleged tort was to steal business from the Arkansas plaintiffs.[132] Whether or not *Ground Connection* was correctly decided, there is a lot of daylight between its facts and the facts in our case. In *Crain CDJ LLC v. Regency Conversions LLC*, the defendants—who modify previously manufactured cars—and the plaintiffs (who purchased such cars for resale) had an ongoing and continuing business relationship.[133] This case was not about a one-off sale. Moreover, the intentional tort involved repeated bribery of an Arkansas employee of the plaintiffs to get him (on behalf of the plaintiffs) to purchase multiple cars from the defendants. The defendants sent multiple checks into Arkansas and visited Arkansas multiple times as part of the overarching scheme. Whether or not *Crain CDJ, LLC* was correctly decided, there is a lot of daylight between its facts and the facts in our case. Neither case persuades

---

[131] *See, e.g., Johnson*, 614 F.3d at 793-94.

[132] No. 5:17CV00196 JLH, 2017 WL 4582795, at *4 (E.D. Ark. Oct. 13, 2017).

[133] No. 4:08CV030605WRW, 2009 WL 973490, at *4 (E.D. Ark. Apr. 9, 2009).

the Court that the unique facts in our case satisfy the due process requirements for constitutionally asserting jurisdiction over Sparks Motors.

### Conclusion

For the foregoing reasons, the Court determines that it cannot constitutionally assert personal jurisdiction over Sparks Motors.  However, instead of dismissing the case, the Court will transfer the case to the United States District Court for the District of Utah.  Both parties agree that, in such a situation, the Court has discretion under 28 U.S.C. § 1406(a) to transfer the case instead of dismissing it.[134]

Sparks Motors's Amended Motion to Dismiss is GRANTED in part and DENIED in part.  The Clerk of the Court is directed to TRANSFER the entire case file to the District of Utah.

IT IS SO ORDERED this 28th day of August 2020.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[134] Def.'s Br. (Doc. 24) at 1-2; Pl.'s Resp. (Doc. 25) at 1-2.  Even assuming that the retrieval of the car from Arkansas provided the needed hook to constitutionally assert specific personal jurisdiction over Sparks Motors with respect to the conversion claim and small portions of the fraud and deceptive trade practices claim, *but see supra* at note 128, the interests of justice would favor a venue transfer of those claims to the District of Utah.  The claims are highly related to the other claims in this case, which can only proceed in Utah.  Judicial efficiency, judicial economy, the convenience of the parties, and avoidance of potentially conflicting rulings all counsel in favor of transfer.  This Court can order a transfer on its own motion under 28 U.S.C. § 1404(a).  *See Union Electric Co. v. Energy Ins. Mut. Ltd.*, 689 F.3d 968, 972 ("There is authority supporting the district court's ability to *sua sponte* transfer a case under §1404(a).").